Filed 10/7/15  P. v. Gomez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>VICTOR G. GOMEZ,<br><br>　　　Defendant and Appellant. | D066894<br><br><br>(Super. Ct. No. SCE336328) |

APPEAL from a judgment of the Superior Court of San Diego County, Patricia K. Cookson, Judge.  Affirmed.

Patrick J. Hennessey, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Victor Gomez pleaded guilty to robbery in count 1 (Pen. Code,[1] § 211), after he used what turned out to be a fake gun to rob a liquor store in Santee, California while wearing a beanie over his head and a bandana covering his face. As part of his guilty plea, the court ordered Gomez to undergo a 90-day diagnostic study. (§ 1203.03.) After completion of that study, the court denied Gomez's application for probation and sentenced him to prison for the low term of two years.

Gomez on appeal contends the court abused its discretion by refusing to grant him probation. Specifically, he contends that the court erred in relying on two of the reports prepared in connection with the diagnostic study, which recommended prison, and on the probation reports, which likewise recommended prison, because those reports relied on information that was in part incorrect. Instead, he contends the court should have relied on and adopted the recommendation of a third report, also prepared in connection with the study, which he claims was more thorough and which recommended probation. Affirmed.

FACTUAL AND PROCEDURAL OVERVIEW[2]

In the evening on December 10, 2013, the San Diego County Sheriff's Department received a report of robbery at a liquor store in Santee. The suspect, later identified as Gomez, was described as wearing a dark-colored hat or beanie and a bandana over his

---

[1] All further statutory references are to the Penal Code.

[2] This summary is derived in part from the probation report, given Gomez pleaded guilty.

2

face. The suspect was armed with what appeared to be a real handgun (which, as noted, turned out to be fake). It was reported the suspect took all the money from the cash register.

Less than five minutes after the report, a sheriff deputy observed a man later identified as Gomez wearing a blue long-sleeved shirt and walking on a street near the liquor store. The deputy pulled up behind the man and used a spotlight to illuminate him. The man immediately put both hands in the air. On contact, the man was nervous and was sweating profusely on what was otherwise an abnormally cold San Diego night. The man also appeared winded.

When the deputy asked the man what was inside his backpack, the man answered, " 'Props for a play.' " When the deputy asked what kind of props, the man stated, " 'A cap gun.' " The deputy conducted a " 'pat down' " search of the man for weapons and found a " 'large wad' " of cash. In the backpack, the deputy found an "unloaded 9 mm handgun, [a] green bandana, black gloves, [a] grey long sleeve t-shirt, and a . . . beanie."

At a curbside lineup, the victim could not positively identify the man as the suspect because the suspect had been wearing the beanie and the bandana during the robbery. However, the victim positively identified the bandana and the handgun used by the suspect.

Deputies subsequently obtained the liquor store's surveillance video. It showed a male suspect enter the store wearing a dark-colored beanie over his head, a blue long-sleeve shirt and grey jeans. The suspect covered his face with a dark-colored bandana.

3

The suspect entered through the front door, pointed a gun at the store clerk and gave the store clerk "zip ties." The video showed the suspect then helped the store clerk tighten the zip ties around the clerk's hands, before walking around the counter, opening the cash register and taking all of the money.

The store clerk told police he was traumatized by the robbery, as the clerk had personally known people who had been shot and killed during liquor store robberies. The clerk also told police that as the suspect was taking the money from the cash register, a woman and her son walked into the store. According to the store clerk, this startled the man and caused him to run out of the store.

Pursuant to a Fourth waiver, deputies searched Gomez's bedroom later that same night. The search revealed a wallet, a driver's license, a social security card and credit cards belonging to a third party. Deputies also found under Gomez's bed prescription medicine belonging to a different third party. A records check showed the owner of the driver's license had previously reported his wallet stolen from his car. The owner subsequently confirmed the wallet and its contents belonged to him. Gomez was charged in count 2 with receiving stolen property. (§ 496, subd. (a).)

Gomez pleaded guilty to "unlawfully, and by means of force and fear, [taking] personal property from the immediate possession of another." As part of the plea agreement, count 2 was dismissed, as was the firearm enhancement charged in count 1. The plea agreement provided Gomez still faced a maximum five-year sentence on count 1.

4

DISCUSSION

A. *Additional Background*

When the court took Gomez's guilty plea, it noted his case was "necessarily a prison case." However, because of Gomez's youth (i.e., he was 21 at the time of the offense), the court as noted ordered a 90-day diagnostic evaluation and stated it would follow the recommendation from the California Department of Corrections and Rehabilitations (CDCR).

The record shows there were three recommendations from CDCR. Correctional Counselor J. Magallon recommended the court sentence Gomez to prison. In reaching this opinion, Magallon relied on Gomez's probation report, a personal interview with Gomez, and a case conference with a unit officer where Gomez was being housed.

Gomez's account of the robbery was the same as was provided in the probation report. Gomez told Magallon he needed money to survive and felt he was not meeting his parent's expectations of him. Gomez stated he should not have been "so impulsive" in committing the robbery and instead should have gone to the welfare office to apply for food stamps and general aid.

In recommending a prison sentence, Magallon noted that the robbery was a serious felony offense as defined in section 667.5, subdivision (c)(9); that Gomez in January 2011 had been convicted of misdemeanor theft in violation of section 484 and placed on

three years' probation; that Gomez had his probation revoked five times;[3] that Gomez stated he was addicted to marijuana and used "wax," or a concentrate of marijuana, by spraying liquid nitrogen into a glass tube containing marijuana, which then froze the THC crystals which are then vaporized; and that Gomez had failed to pay his $635 fine as a result of the 2011 conviction. As such, Magallon found that Gomez's criminal conduct had increased in "severity" and in "sophistication" and that Gomez's "potential for functioning successfully in probation [was] minimal."

Classification and Parole Representative Doreen Marquez also recommended the court sentence Gomez to state prison. Marquez in her report incorrectly stated that Gomez pleaded guilty to first degree residential burglary in violation of sections 459 and 460. In any event, in recommending prison Marquez noted that Gomez pleaded guilty to a crime that was a serious felony as defined in section 667.5, subdivision (c) (which in fact is true); that she agreed with Magallon's conclusion that Gomez's chances for success on probation were minimal; and that she believed Gomez posed a "significant" threat to the safety of the community.

A third report was done by Michael Flesock, Ph.D, staff clinical psychologist. Flesock recommended the court sentence Gomez to probation. Flesock based his recommendation on two interviews with Gomez that lasted a total of 175 minutes, and on a March 6, 2014 psychological evaluation report of Gomez. Flesock noted that Gomez

---

3    Gomez disputes his probation on the misdemeanor theft was revoked five times. We note, however, the record is ambiguous on the number of times it was revoked and the reason or reasons it was revoked.

6

spoke about the relationship, or lack thereof, between him and his parents for 15 to 20 minutes and that Gomez described his relationship with his father as "distant, avoidant, and strained" and his relationship with his mother as "close and loving," although she tended to " 'micromanage[] him and be manipulative.' "

Flesock noted when Gomez was about 14 he began receiving treatment for depression and ADHD. When Gomez was between the ages of 18 and 21, he took psychiatric medications sporadically, mainly for depression. Gomez also began smoking marijuana in high school and estimated he was smoking three-quarters of an ounce each week by age 18. When Gomez turned 19, he began using concentrated THC in the form of "butane hash oil, or 'wax.' " According to Flesock, Gomez thereafter used "wax" exclusively. Gomez reported he attended outpatient substance abuse treatment for six months when he was 18, then left the program after relapsing. Gomez went back to the program when he was 19 or 20 and left the program four months later, confident that he could remain sober. However, Gomez relapsed two weeks later when he started using "wax" again.

Flesock noted that Gomez had a "severe problem" with marijuana dependence; that Gomez's use of "wax" in increasing amounts may have caused Gomez "neurological damage" because of its extreme potency and Gomez's "high intensity substance abuse"; and that this in part could explain why Gomez committed the robbery, as Gomez indicated he had stopped using "wax" a month or two before the crime. In any event,

7

Flesock concluded the robbery was a "constellation of extreme circumstances" that were "unlikely to recur."

The October 14, 2014 supplemental probation report recommended the court sentence Gomez to five years in state prison. In so doing, the report noted during his probation interview Gomez "blamed his family and the possibility he would be asked to leave the family home as the reason for the commission of the robbery. He was visibly upset when talking about his family, especially his father. The undersigned would point out that the appropriate response for not agreeing with parental rules, at the age of 21, is to get a job and move out, not rob a liquor store with a weapon. The fact the defendant used a weapon, concealed his identity with a bandana and beanie, and had the forethought to bring zip ties for the clerk, shows planning on the part of the defendant. Although the defendant appears to have lacked a 'get away plan' the actual robbery does not appear to be an impulsive act. No matter the type of handgun used, the victim was threatened with said weapon and believed his life was in danger. Also concerning to the undersigned is the fact a mother and son walked into the store during the commission of the offense. Not only was the clerk in danger, but the potential for citizens to be hurt, traumatized, or worse, was also a possibility."

The record shows Gomez submitted a 27-page statement in mitigation in support of his contention the court should grant him probation. The statement includes myriad letters in support of Gomez.

At the sentencing hearing, the record shows the court heard from Gomez, both of Gomez's parents and the argument of counsel, and stated it had reviewed all the reports and the statement in mitigation. The record shows defense counsel informed the court of some incorrect information in connection with the diagnostic reports of Gomez. In connection with Magallon's report, defense counsel argued Gomez did not have several violations while on misdemeanor probation (from the 2011 offense). Instead, it was defense counsel's "understanding" that Gomez had only one violation "for not checking in," and that "then there was a fine issue where apparently Mr. Gomez got behind in fines." Thus, defense counsel did not believe there were five violations as set forth in the Magallon report.[4]

Defense counsel next argued Marquez's report was less than credible because Marquez incorrectly stated in that report that Gomez had been convicted of first degree burglary and because she, unlike the other two evaluators, did not actually interview Gomez in connection with her report.

At the conclusion of the testimony, as noted, the court sentenced Gomez to the low term of two years in state prison, stating in part as follows:

"This is a tough case because, Mr. Gomez, you have a lot of family support. I have to tell you I was taken aback by the statements you made . . . about the vitriol, the hatred between your parents, the sibling rivalry. What I got from that is I do believe you're a danger to society.

---

[4]     See footnote 3, *ante.*

"You were diagnosed as being antisocial. The marijuana dependency, not a problem. When you elevated it to wax, that's a whole different spectrum. You claimed you were not under the influence when you committed the robbery. I will accept your statement at that. But I'm not going to quarrel with experts who find you to be a danger to the community. I'm telling you this because I'm going to deny probation.

"Having said all that, the probation officer recommended the upper term. I am going to cite factors to give you the lower term, because I am cognizant of the family support. I'm going to accept you at face value; that seven months of sobriety has helped you out, but you still need to be punished for this crime."

B. *Guiding Principles and Analysis*

" 'All defendants are eligible for probation, in the discretion of the sentencing court [citation], unless a statute provides otherwise.' [Citation.] 'The grant or denial of probation is within the trial court's discretion and the defendant bears a heavy burden when attempting to show an abuse of that discretion. [Citation.]' [Citation.] 'In reviewing [a trial court's determination whether to grant or deny probation,] it is not our function to substitute our judgment for that of the trial court. Our function is to determine whether the trial court's order granting [or denying] probation is arbitrary or capricious or exceeds the bounds of reason considering all the facts and circumstances.' [Citation.]" (*People v. Weaver* (2007) 149 Cal.App.4th 1301, 1311, disapproved on other grounds in *People v. Cook* (2015) 60 Cal.4th 922, 939.)

Here, Gomez contends the court's decision to impose the low term of two years was "simply not the proper choice." Specifically, Gomez contends that the court erred when it relied on the two reports prepared by the CDCR, which recommended Gomez be sent to prison, and on the probation report and supplemental probation report, which also recommended a prison sentence. Gomez instead contends the court should have relied on Flesock's report, which he contends is inherently more reliable because Flesock spent the most time with Gomez and thus allegedly had "true insight" into Gomez.

As noted *ante*, the record clearly shows at the time of sentencing that the trial court was aware of both the aggravating and mitigating factors related to Gomez and of the mistake in the Marquez report regarding the offense Gomez committed. The record also clearly shows the court knew it had the discretion to grant Gomez probation and recognized Gomez's strong family support, but decided against doing so on the basis that Gomez already had exhibited antisocial behavior. The court also found Gomez was a threat to the community, which finding, we note, is amply supported by the record in light of the evidence. Indeed, Gomez wore a bandana around his face, used what appeared to be a real handgun and robbed a liquor store because he needed money, believing his family/father was then in the process of kicking him out of the family home.

That Flesock recommended probation does not change our conclusion the trial court properly exercised its broad discretion in denying Gomez probation in this case. It was up to the trial court, and it *alone*, to determine whether to accept Flesock's recommendation and grant Gomez probation and require among other conditions that he

11

attend an inpatient drug treatment program. That the trial court rejected that recommendation and instead sentenced Gomez to the low term of two years was clearly within the trial court's discretion.

California Rules of Court, rule 4.414 (rule 4.414) provides criteria affecting the decision to grant or deny probation. Only a single factor set forth in rule 4.414 is required to justify a denial of probation. (*People v. Scott* (1994) 9 Cal.4th 331, 350, fn. 12.) A trial court may reject or disregard any mitigating circumstance without stating reasons. (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1583.)

Here, looking at rule 4.414, we note there are several factors that apply showing the trial court was justified in denying Gomez probation, including that the crime was serious, as noted (rule 4.414(a)(1)), and that Gomez was an "active participant" in the crime (rule 4.414(a)(6)); that Gomez was in fact armed with what appeared to be a real gun (rule 4.414(a)(2)); and that the victim of the robbery—the store clerk—was vulnerable, as he was working behind the counter when Gomez pointed a gun at him, and was traumatized by the robbery (rule 4.414(a)(3)).

Moreover, as noted, the record also shows the court found Gomez was antisocial and dangerous to society, a finding supported by the record. The record also supports the finding Gomez's criminal conduct was becoming increasingly serious. (Rule 4.414(b)(1) & (8).)

DISPOSITION

The judgment of conviction is affirmed.


BENKE, J.

WE CONCUR:


McCONNELL, P. J.


McDONALD, J.